## WESTERN DISTRICT.

# Pennsylvania Railroad Company *versus* McCloskey's Administrator.

_. In an action by an administrator to recover damages for the loss of the life of his intestate, through the defendant's negligence, the Court instructed the jury that they might compute the damages by the probable accumulations of a man of the age, habits, health, and pursuits of the deceased, during what would have probably been his lifetime; and added, that if the jury could find a better rule, they were at liberty to adopt it.   *Held*, that there was no error in this direction.

2. The jury must, in such case, place a money value on the life of an individual, in the same manner that in other cases they estimate the value of health and reputation.   The law can furnish no definite measure for damages that are essentially indefinite.

3. A railroad company carrying passengers cannot shield themselves from the consequences of their negligence, by showing that a person injured obeyed specific instructions of the conductor, instead of general directions of which he had been informed.

4. Assuming that a public company of carriers may contract for other exemptions from liability than those allowed by law, still a contract will not exempt from liability for gross negligence.

5. A regulation by which a passenger with live stock, on the freight train, is required to remain on the cars which contain his stock, is not so transgressed by his being in another part of the train, when it is at rest, as to make him a contributor to his own injury by that train being run into by another.

ERROR to the District Court of *Allegheny county.*

Action on the case against the railroad company for the loss of the life of William McCloskey by the negligence of the agents or servants of the company.  The action was brought by the administrator of the estate of the deceased.

William McCloskey, on the 1st March, 1853, put on board the company's cars at Pittsburgh a drove of horses destined for Philadelphia.   It appeared in evidence that the regulations of the company required that, before any undertaking to carry live stock should be made, the owner of the stock should sign an agreement to travel on the cars containing his stock, and give his care and attention to it, act under the orders of the conductor, and release the company from all liability for personal injury, however incurred; and there was some evidence, but strongly contradicted, that such an agreement had been signed by him, and that he knew of the regulation.

When the train was on its way, on the 3d March, about 11 o'clock at night, near Newton Hamilton, it was stopped by the bursting of a flue of the engine.   Arrangements were immediately made to warn approaching trains of the accident; but, for reasons not necessary to mention, the warning failed to reach the train from the west, and a collision followed, which caused such injury

to McCloskey that he died in a short time. The jury found that the collision arose from the gross negligence of the company's agents.

When it happened McCloskey was not in the cars containing his stock, and those cars sustained no injury; but he was in the emigrant car, which was crushed by the collision, and the jury found that he was there by the direction of the conductor.

McCloskey, at the time of his death, was childless and unmarried, and he left two sisters as his next of kin, and it did not appear that they had suffered any pecuniary loss by his death. It was therefore contended that no more than nominal damages could be recovered; but WILLIAMS, J., thought otherwise, and instructed the jury as appears in the opinion of this Court.

He further instructed them that the direction of the conductor entitled McCloskey to be in the emigrant car, and that the release from liability, if signed by McCloskey, did not protect the company from damages occasioned by the gross negligence of its agents. These instructions were the principal matters complained of as error. The plaintiff had a verdict and judgment for $4500.

By the Act of 1st April, 1836, it is provided, that if any person shall become injured, either in person or property, through or by reason of the gross negligence or wilful misconduct of the driver of any public stage, &c., carriage, or car, employed in the conveyance of passengers, or through or by reason of the gross negligence or wilful misconduct of any engineer or conductor of any locomotive, engine, &c., "such driver, engineer, or conductor shall be deemed guilty of a misdemeanor;" and on conviction shall be punished by a fine not exceeding $50, and by imprisonment not exceeding twelve months, "provided that the provisions of this Act shall not interfere with the civil remedies against the proprietors or others to which the party injured may by law be now entitled."

By the 18th section of the Act of 15th April, 1851 (*Acts*, p. 674), it is enacted, that no action hereafter brought to recover damages for injuries to the person by negligence or default, shall abate by reason of the death of the plaintiff, but the personal representatives of the deceased may be substituted as plaintiff, and prosecute the suit to final judgment and satisfaction.

Section 19. That whenever death shall be occasioned by unlawful violence or negligence, and no suit for damages be brought by the party injured during his or her life, the widow of any such deceased, or if there be no widow, the personal representatives, may maintain an action for and recover damages for the death thus occasioned.

*J. H. Hampton* and *Stokes*, for plaintiff in error.—Carriers may limit the extent of their common law liability by contract or by

[Pennsylvania Railroad Company *v.* McCloskey's Administrator.]

notice: 4 *Harris* 68; 5 *Rawle* 189; 6 *W. & Ser.* 500; 8 *Barr* 484; *Angell on Carriers,* § 247; 4 *Bing.* 218; 2 *Stark.* 53; 19 *Wend.* 251, 234; 9 *Watts* 87; 8 *W. & Ser.* 373; 11 *Eng. L. & E.* 506; 7 *Id.* 395. A corporation may make such regulations as are proper for the conduct of its business: *Angell on Corp.* § 325; 1 *L. Raym.* 496; 2 *Jones* 321.

The Act of 15th April, 1851, s. 19, on which this action is founded, was not intended to punish for negligence. The Act of 1st April, 1836, s. 1, makes gross negligence punishable. Compensation alone can be claimed in this case—compensation *to the* party suing, for the damage which he, or those whose pecuniary interests he represents, have sustained. No person has suffered any pecuniary damage: 10 *Eng. L. & E.* 437. The learned judge has furnished the jury with no measure of damages. He has left the amount entirely to their discretion.

*Shaler* and *Stanton,* for defendant in error.—No limitation of responsibility can excuse gross negligence: *Doct. and Student* 224; *Angell on Carriers,* § 267, 268, 275; 4 *Scott* 509; 4 *Harris* 77; 19 *Wend.* 251; 31 *Maine* 228; 2 *Richardson* 286. The law allows the plaintiff to recover "damages for the death." On a very similar British statute, 9 & 10 Vict. c. 93, the jury were instructed very much as in this case: 10 *Eng. E. & L.* 437; 11 *Jurist* 758.

The opinion of the Court was delivered by

LOWRIE, J.—The learned judge of the Court below allowed the jury to find the damages according to the value of the life lost, and suggested that, in estimating them, they might compute them by the probable accumulations of a man of such age, habits, health, and pursuits, as the deceased, during what would probably have been his lifetime; and then added: "I think this would be a fair measure of damages in this case; but if the jury can find a better rule than the one suggested, they are at liberty to adopt it."

To this it is objected, that it gives to the representatives of the deceased more than compensation; that is, more damages than they have suffered by the death, and that this judgment acquires a punitive character, which, it is said, could not have been intended, since the law has manifested its punitive will in a different form, by providing for the punishment of the really guilty persons, the servants of the company, in the Act of 1st April, 1836.

The latter part of this argument is answered by saying that there are many cases in which vindictive damages are given, though the act is also subject to punishment; and this is a denial of the unexpressed premises of the argument, and therefore the conclusion is left without support, and we are saved the necessity of showing that it is a mere assumption to call such damages punitive.

[Pennsylvania Railroad Company v. McCloskey's Administrator.]

The main purpose of the argument, however, is to show that the representatives appointed by the law in such a case, are entitled to no more damages than they have individually sustained, and it requires a more extended consideration.

Heretofore no action has been allowed among us for the death of a freeman, and the novelty of the case contributes to the difficulty of determining it, and warns us to proceed with appropriate caution. But strange as the case is in our jurisprudence, we are not without analogies here and elsewhere which may furnish us some light.

The principle that requires compensation for the death of a freeman, is not at all new in history. It was long an institution among our Anglo-Saxon ancestors; and perhaps it was never positively abolished, but rather died out under the influence of the Norman conquest, and the centralizing powers of the king's Courts, which treated all such wrongs as wrongs done to the king—and hence as criminal offences. It seems to have been an institution common to all Germanic nations, and perhaps to every people that rose one degree above the savage life, and were still striving to rise. With them it was intended as a compensation to surviving kindred, and as a means of preventing the disorders that follow in the train of private revenge.

There are indications of its existence among the Romans (*Dig.* 9, 2, 7, 4, also 9, 2, 9, and 31), though Pasquier (*Inst. de Just.* 4, 3) expresses doubts about it. Voet (*Pandects* 9, 2, 11) and Pacius (*Analysis Institutionum* 4, 3, 1) refer to it as existing there, and also in Holland, the Netherlands, and perhaps in some other parts of modern Europe, and we have evidence of its existence in Scotland: *Erskine's Inst.* 592, n. 13; *Bell's Principles of Law* 749; 10 *Eng. L. & Eq. R.* 437. As it existed among the Romans, the damages recovered by the kindred were not by way of hereditary succession; for damages for wrongs done to the body of a freeman were not allowed to pass in that way: *Dig.* 9, 3, 5, 5; *Pothier's Pand.* 9, 3, 12.

A recent English statute, 9 and 10 Vict. c. 93, seems to have revived the principle of the old Saxon law, and to allow the relations of the deceased to recover damages to be apportioned among them according to the injury resulting to them respectively. In form therefore the action is for their own loss, and not a survival of the right of action for the injury to the deceased. Yet the English Courts have not known how to estimate the damages, except according to the value of the life lost: 10 *Eng. L. & Eq. Rep.* 437; Armsworth *v.* S. E. Railway Co., 11 *Jurist* 758; 6 *Harr. Dig.* 273; and this statute seems to leave other injuries to the person just as they were before, and consequently, a death from another cause, before compensation recovered, is not provided for.

But it is asked, how can one that is dead be compensated by a

civil procedure, for injuries done to him in his life, and especially for the loss of his life? This directs us to another aspect of the present claim that is not as new as the one already noticed.

In the early stages of our law all rights of action for wrongs done, not breaches of contract, died with the injured person. This, however, was altered by statute 4 Ed. 3, c. 7, and this alteration has been very largely extended by construction; and by our statute, 24th February, 1834, s. 28, nothing was excepted but slander, libel, and wrongs to the person. Many of the cases, thus declared to survive, involve questions of compensation, and exemplary damages for wrong and insult, fraud and malice, which are to be decided upon, and executed after the injured party is beyond the reach of civil compensation, and yet the injury is measured just as if he were still living.

There are abundant indications of the same law of survivorship in the Roman law in regard to such injuries; *Inst.* 4, 12, 1; *Dig.* 44, 7, 26, and 58; *Dig.* 50, 17, 139, and 164; *Heineccius Elementa Juris.* ss. 1193, 1194; *Pacius Analysis Inst.* 4, 12; and these embrace a wider range of injuries than have been heretofore saved from death by our law; for they include all cases actually commenced in the lifetime of the injured party, and prevent their abatement by his death.

Our Act of 15th April, 1851, seems to express its purpose better than the English one heretofore referred to; for in one section it simply provides that the action commenced for injuries to the person shall not abate by the plaintiff's death, but shall survive by substitution of his personal representatives; and in another, that if no suit for damages be brought during life by the party mortally injured, by negligence or violence, then the widow, and if there be no widow, the personal representatives, may maintain an action for damages for the death.

The first of these sections is very plain, and it provides that the personal representatives may continue the action commenced, that is, may proceed and recover the very damages to which the deceased would have been entitled, had he survived until verdict and judgment.

The other section is somewhat less definite in regard to the damages intended; but this very indefiniteness is proof that no other thought was in the mind of the legislature than the wrong and damage done to the decedent: else it would have been made to appear. If one section related to damages done to the deceased, and the other to damages done to his relatives, these contrasted thoughts could hardly have failed to come out clearly in the expression.

But even if this were otherwise, we do not perceive how it could influence the damages; for they must necessarily be measured by the absolute value of the life lost, and not by the pecuniary loss

[Pennsylvania Railroad Company v. McCloskey's Administrator.]

which the designated representatives shall have thereby sustained. The precept involved in the law is, "Thou shalt not by negligence or violence take away the life of another;" and the sanction of the law lies in the duty of compensation for the life destroyed, measured according to its own merits and not according to the necessities and circumstances of his kindred. It is very hard to value; but not for that, more uncertain than the speculations in relation to damages, which are proposed in its stead.

This thought is involved in the whole course of the legislation and jurisprudence already referred to, and it is a rejection of the idea that the negligence which destroys life is irresponsible, and an assertion of the principle that all negligence must answer for its result, however serious. We have not heretofore been startled at the absurdity of giving a pecuniary compensation for broken limbs, or ruined health, or shattered intellect, or tarnished reputation.

If the body be all crushed, we have regarded its sufferings as a subject of civil compensation so long as life smoulders beneath the ruins; even though there be no capacity to appreciate or enjoy compensation. We ought not to be startled that the duty of compensation is continued, when such life is smothered out.

We call it compensation, while we admit that money is a very insufficient and uncertain measure of all such injuries. But it is the best standard we have, and in practice it is not found to be absurd. The duty of the wrongdoer to make compensation is very plain, and such as he has, which the law can reach, it compels him to give: though it may never reach the consciousness of the person injured. It is an act of distributive justice in vindication of invaded right, and it adopts the best approximation to compensation, which the authority of the law can enforce. And in these times, when criminal justice presents so many symptoms of going out of repute, and police officers are so often held up to public indignation for their performance of duty, it is found to operate well. Call it punitive; yet it is only indirectly so, as all compensation is, and does not wipe out any offence that is involved against the state. From our present experience and observation, therefore, we are unable to discover any substantial error in the instructions complained of. It would be wrong to limit the value of a man's life by his probable accumulations, for many men make none in a lifetime, and many have arrived at an age when they no longer attempt to make any, and many women never make any; and yet every one is entitled to his life, and we have as yet discovered no standard for its valuation. It is not human possessions that are destroyed, but humanity itself; and as this has no market value, it must necessarily be very much a matter of human feeling.

Hard, then, as the task may be, and however uncertain its results, it is to be performed by the jury, aided by the cautions

[Pennsylvania Railroad Company *v.* McCloskey's Administrator.]

and counsels of the judge, who has been trained in the consideration of juridical questions. Looking, on the one hand, to the dignity of human nature, as it has been assailed, and on the other to the position and rights of the defendant, and considering the dignity of their positions as judges of most sacred right, and their own dignity and responsibility as individuals, and loving mercy even while doing justice, the jury must place a money value upon the life of a fellow being, very much as they would upon his health or reputation. The law can furnish no definite measure for damages that are essentially indefinite.

The other points in this cause we feel compelled to dispose of in a few brief propositions:

A railroad company carrying passengers, cannot allege that a passenger is in fault in obeying specific instructions of the conductor, instead of the general directions of which he has been informed.

Assuming that a public company of carriers may contract for other exemptions from liability than those allowed by law, still such a contract will not exempt from liability for gross negligence.

A regulation by which a passenger with live stock on the freight train is required to remain on the cars which contain his stock, is not so transgressed by his being in another part of the train, when it is at rest, as to make him a contributor to his own injury by that train being run into by another.

Judgment affirmed.

BLACK, C. J., and WOODWARD, J., dissented.